**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DAWN S. LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:14-cv-1584-PPS |
| | ) | |
| MEMORIAL HOSPITAL OF | ) | |
| SOUTH BEND, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Dawn Lewis was fired from her job as a Community Health Coordinator
for Memorial Hospital of South Bend for what the hospital says was poor
performance and her inability to respectfully communicate with her supervisor.
Lewis, who is African-American, says that she was the victim of race
discrimination and that this was the real reason for her termination. The case is
now before me on Memorial Hospital's summary judgment motion.

The problem with Lewis' case is that she has designated *no additional
evidence* beyond what the hospital presented in its motion for summary
judgment. Memorial Hospital has given me their side of the story, and for
whatever reason, Lewis hasn't pointed me to any additional evidence. The
evidence proffered by the Hospital persuasively shows that Lewis' supervisor
viewed Lewis as a poor performer and a difficult employee to deal with.

Whether those are good enough reasons to sack someone is a matter left to the powers that be at Memorial Hospital. But what is clear from the evidence is that the Hospital's decision was not prompted by any racial animus. So on this record, the Hospital's summary judgment motion, [DE 26], must be **GRANTED**.

**BACKGROUND**

Lewis began her employment at Memorial Hospital in 2003 as a Patient Care Assistant. [DE 27-1 at 2-3]. In January 2005, Lewis transferred to the position of Community Health Coordinator at the Hospital. *Id.* at 4. The Community Health Coordinators were responsible for developing health awareness programs such as sexual abstinence in local schools. *Id.* at 5. At some point there became a concern that the Hospital may not have been getting a good bang for its buck with the Community Health Coordinators – there were four of them. In response to this concern, in July 2011, Debra Raybold became the supervisor over the Community Health Coordinators, including Lewis. Raybold's boss, Margo DeMont, made it clear to Raybold that she had concerns about the productivity of the Community Health Coordinators and their whereabouts during the day. Raybold's charge from DeMont was to run a tighter ship. At the time of Lewis' termination, there were three other Community Health Coordinators – one of whom was Hispanic, one of whom was white, and one of whom was African-American. Upon Lewis' termination, Raybold hired Penelope Beasley to replace her. Beasley is African-American. [DE 27-3 at 2].

2

When Raybold took over, expectations changed. *Id.* She demanded more accountability from the Community Health Coordinators, and Lewis did not respond well to the changes. According to the evidence presented by the Hospital, she frequently became upset when Raybold would question Lewis about her time usage and her productivity. *Id.* Lewis was quite verbal about her frustrations of more demands being placed on her and a higher level of accountability. Over time, this led to a deteriorating relationship between Raybold and Lewis that was marked by accusations and defensiveness. *Id.* Lewis herself admitted in her deposition that there was a communication problem between her and Raybold. [DE 27-1 at 36-38].

There were other problems that Lewis was having at work. Raybold had received word that Lewis was using part of her work day to talk on her cell phone, which is against Hospital policy. Raybold raised the issue in Lewis' performance review. Lewis didn't deny the charge of making the calls. [DE 27-3 at 3]. Instead, Lewis said it was unfair to be raising the issue at the time of the performance review instead of calling her attention to the problem when it occurred. Lewis dismissed the issue as "nitpicking" but she also admitted that Raybold's raising of the issue about her cell phone usage had nothing "to do with [her] race." [DE 27-1 at 58]. Lewis and the other coordinators were also routinely parking in parking spots reserved for patients. Raybold sent an email to all of the

Community Health Coordinators to please refrain from doing that. Lewis questioned the directive. [DE 27-3 at 3].

As part of her efforts to bring more accountability to the Community Health Coordinator position, Raybold required each Coordinator to develop a self-directed non-curriculum program of interest to them. Lewis chose to develop an after school teen program, and she spent 140 hours working on the project. Despite spending nearly a month's worth of time on the project there was little to show for her efforts. [DE 27-5]. When Raybold questioned her about the lack of productivity, Lewis became frustrated and angry. *Id.*

Since Lewis' performance was not up to snuff, Raybold had a meeting with her to address Lewis' shortcomings. At Memorial Hospital, they call this a "Coaching Meeting." [DE 27-3 at 5; DE 27-7]. At the meeting, Raybold specifically laid out her concerns about Lewis' performance including her failure to meet deadlines; her use of overtime without approval; and her failure to deliver on the non-curriculum project despite the inordinate amount of time that she put in on it. [DE 27-3 at 5].

About six weeks later, Lewis turned in a mileage reimbursement request that did not make sense to Raybold. When Raybold asked Lewis to explain it to her, Lewis escalated the matter by turning the tables on Raybold and claiming that Raybold was accusing her of cheating on her mileage. [DE 27-3 at 5-6; DE 27-1 at 62-64]. According to Raybold, she was doing no such thing. She had asked an

entirely legitimate question, and Lewis' response was defensive and combative. *Id.*

Around the same time, despite being told to keep overtime to a minimum, Lewis incurred unauthorized overtime. Because Lewis was previously coached on this subject a few weeks earlier, Raybold issued her a warning in a second coaching session. [DE 27-3 at 7]. But before Raybold could draft up the warning, Lewis appealed the decision to the Hospital's Human Resources Department. *Id*. A mediation ensued, and it did not go well. Lewis was argumentative and perpetually interrupting Raybold during the meeting. Nothing got resolved at the mediation and the matter ended in an impasse. [DE 27-3 at 7].

A few weeks later, it was time for Lewis' annual performance review. Because the review was not going to be a positive one for Lewis, Raybold requested that her boss, Ms. DeMont, be present for the review. Raybold gave Lewis a below average evaluation – a 2.33 out of 5 – which fell into the category of "Results need to be improved." Lewis was argumentative and defensive at the meeting. [DE 27-3 at 8]. The conversation lasted for 1 ½ hours and became increasingly confrontational. Eventually, it became clear to Raybold that the relationship between her and Lewis was beyond repair and she terminated Lewis. *Id.*

Lewis appealed the termination decision and Memorial Hospital held what it calls a "Fair Treatment Hearing." At the hearing Lewis said that it was

her belief that she was treated unfairly; she viewed her termination as retaliatory because she previously went to human resources and requested mediation in reference to her prior dispute with Raybold. But at no time during the Fair Treatment Hearing did Lewis complain of racial discrimination or harassment, or complain that her employment had been terminated because of her race. At the conclusion of the Fair Treatment Hearing, Memorial Hospital reversed the termination decision and allowed Lewis to go on unpaid leave so as to give her an opportunity to find another position with Memorial Hospital, but she was ultimately unsuccessful in doing so. *Id.* at 8-9.

As I noted at the outset of this Opinion, Memorial Hospital presented a 14 page statement of undisputed material facts in its brief in support of summary judgment. [DE 27 at 2-16]. The evidence supporting those factual matters were placed in an appendix to the summary judgment motion. [DE 28]. In response, Lewis only designated those parts of her deposition that Memorial had previously designated. [DE 34]. Lewis believes she was good employee, that her productivity was fine and she had no problem meeting deadlines. [DE 27-1 at 73-74]. But she did concede that there were areas that she needed to improve upon, including in how she communicated with her supervisor, Ms. Raybold. *Id.*

It is clear from the summary judgment record that at no point in time did Lewis ever claim that she was the victim of race discrimination – not during the coaching sessions, not during the mediation, not during the final performance

6

review that led to her termination and not during the Fair Treatment Hearing. Indeed, when pressed in her deposition, Lewis could not point to a single instance that even remotely touched upon her race during any of her interactions with Raybold or at any other time during her employment at the Hospital. Lewis never complained to DeMont (Raybold's boss) about racial discrimination in the workplace or raised any other concern about being treated poorly because of her race. Lewis thus admitted that Raybold never said anything to her – demeaning or otherwise – about her race. [DE 27-1 at 74-75]. The closest she could come was her testimony that Raybold made her feel "uncomfortable." But when pressed, Lewis conceded that the discomfort mostly related to Raybold challenging her on her job performance.

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A nonmoving party like Lewis is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

There are two ways for a plaintiff to overcome a summary judgment in a Title VII case – the familiar indirect and direct methods of proof. *Silverman v. Board of Education of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011). But recently, several judges on the Seventh Circuit have expressed some reservations about whether these clunky constructs still serve any useful purpose. *See, e.g., Coleman v. Donahue*, 667 F.3d 835, 862-63 (7th Cir. 2012) (Wood, J., concurring); *Hitchcock v. Angels Corp., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013). The various multi-factor tests that have developed over the years in both indirect and direct method of proof cases are frequently a confusing maze that often cloud the decision-making process rather than enhance it. As Judge Wood described it in her concurrence in *Coleman*, a much simpler way to proceed would be to ask the following question when confronted with a summary judgment motion:  has the plaintiff presented evidence that she is a member of a protected class and suffered an adverse employment action that a rational juror could conclude was taken against her on account of her protected class and not for a non-discriminatory reason? *Coleman*, 667 F.3d at 863.

There is much to be said for Judge Wood's simpler approach to the question. But no matter what formula is used – the indirect method, the direct method, or Judge Wood's formulation – Lewis cannot possibly prevail in this matter. The simple fact of the matter is that Memorial Hospital has presented admissible evidence that Lewis was terminated for reasons having nothing to do

with her race, and Lewis has presented me *no evidence* to the contrary. While I may not have terminated Ms. Lewis for the things she did, my own views on the matter are neither here nor there. It has oft been said that federal judges do not sit as super-personnel departments reviewing decisions of employers. *See, e.g.,* *O'Reagan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001). My sole job is to determine whether the decision was based on some type of discriminatory animus. There simply is no evidence that it was in this case.

I'll start with the indirect method: In order to establish a *prima facie* case of intentional discrimination under the indirect method Lewis must demonstrate that 1) she is a member of a protected class; 2) her employment performance was satisfactory; 3) she experienced an adverse employment action; and 4) she was treated less favorably than one or more similarly situated employees outside of her protected class. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). If she establishes a *prima facie* case, a presumption of discrimination is raised, and the burden shifts to Memorial Hospital to proffer a legitimate, nondiscriminatory reason for its action. *Id*. at 751. If the Hospital proffers a legitimate, nondiscriminatory reason for its action, the burden shifts back to Lewis to produce evidence that demonstrates the Hospital's proffered reason is either not credible or more likely than not pretextual. *Id*.

Lewis is African-American and is therefore a member of a protected class, and she obviously experienced an adverse employment action when she lost her

9

job. I will set to the side for the moment whether Lewis' job performance was satisfactory. Even if I presume that it was, the last prong of the prima facie case dooms her. She has failed to provide any evidence that other similarly situated employees not in the protected class were treated more favorably than Lewis. In order for an individual to be similarly situated to Lewis, she would have to prove "that the individual is directly comparable to her in all material respects. Factors relevant to this inquiry include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualifications." *Burks,* 464 F.3d at 751 (quotation marks and citations omitted); *see also Patterson v. Avery Dennison, Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

I fully recognize that the question about whether someone is similarly situated to the plaintiff is a flexible inquiry. As the Seventh Circuit has made clear, "The Supreme Court 'never intended' the requirement as 'rigid, mechanized, or ritualistic . . . [but] merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Coleman*, 667 F.3d at 846 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). But while the inquiry is flexible, it's not nonexistent. Lewis has to point to *someone* in order to make a comparison. But she has failed to do so. What makes this vacuum so interesting is that it seems that there were other Community Health Coordinators who were white with

10

whom Lewis could have tried to compare herself. But I know nothing about

these other people and whether they serve as true comparators to Lewis. Because

Lewis has failed to provide evidence of a similarly situated employee outside of

the protected class who was treated more favorably than Lewis, she has not

made out a prima facie case of discrimination.

I will note that even if Lewis were to get past the *prima facie* case, Lewis

also has failed to establish that Memorial Hospital's stated reason for terminating

her was a pretext. There is simply no evidence that the Hospital or its decision

maker, Ms. Raybold, lied when she told Lewis she was being terminated for poor

performance and due to her poor communication skills. And that is what a

pretext is: a lie or a phony explanation that covers up the real reason for the

adverse employment action. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir.

2002).

Lewis' case likewise fails under the direct method of proof. "Under the

direct method [of proving discrimination], a plaintiff must come forward either

with direct or circumstantial evidence that 'points directly to a discriminatory

reason for the employer's action.'" *See Burks*, 464 F.3d at 750 n.3 (citation

omitted). Under the direct method of proof, circumstantial evidence of

discrimination includes things like suspicious timing, ambiguous statements, or

behavior toward or comments directed at other employees in the protected

group. It can also include evidence that similarly situated employees outside the

protected class received systematically better treatment. Or it could include situations where employee was qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief. *See, e.g.*, *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 529 n. 4 (7th Cir. 2008).

Lewis has pointed me to no evidence showing that her race motivated Memorial Hospital's decision to terminate her employment. And indeed, the evidence is to the contrary. Lewis admitted at her deposition that Raybold never said anything demeaning to her about her race and never called her racially derogatory names. Nor has she pointed out instances of ambiguous statements that would point directly to discrimination. So Lewis' claim under the direct method of proof necessarily must fail.

It might well be the case that Lewis was treated unfairly by her former employer, Memorial Hospital. That's not for me to decide. This is because getting a raw deal isn't the same thing as getting a raw deal *because you're a member of a protected class.* Lewis needed to point me to evidence showing that the latter is what happened if she wanted to get a discrimination claim past the summary judgment stage, and she simply hasn't done that. Therefore, summary judgment is warranted on the disparate treatment claim.

Summary judgment is likewise appropriate on the retaliation claim. To proceed under any theory of retaliation, Lewis would have to show that she engaged in statutorily protected activity. *Leitgen v. Franciscan Skemp Healthcare,*

*Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). There is simply no evidence that at any time

Lewis complained to *anyone* about any kind of racial animus in the workplace.

There were plenty of chances to raise those kinds of concerns if she believed they

existed – whether it be at the coaching sessions, the mediation or the final

performance review when she was terminated in the presence of Raybold's boss.

Yet Lewis conceded at her deposition that she never lodged such a complaint. So

while Lewis frequently lodged general complaints about how she was being

treated by Raybold, none of these complaints invoked any action protected by

Title VII. *See, e.g.*, *Sitar v. Indiana Dep't of Trans.*, 344 F.3d 720, 727 (7th Cir. 2003);

*Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir. 2000) (complaints of a

general displeasure are not complaints about discrimination). This is fatal to her

claim since one can only be retaliated against for engaging in protected activity if

that person in fact engages in protected activity – which Lewis did not.

### CONCLUSION

For the foregoing reasons, the court **GRANTS** the pending Motion for

Summary Judgment [DE 26] in its entirety. Because this ruling disposes of all the

issues in this case, the clerk shall **ENTER FINAL JUDGMENT** in favor of

Memorial Hospital and against Dawn Lewis. The clerk shall treat this civil action

as **TERMINATED**. All further settings in this action are hereby **VACATED**.

**SO ORDERED.**

ENTERED: November 30, 2015.

s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**